Filed 4/18/22  In re Z.Y. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Z.Y., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br>v.<br>A.D. et al.,<br><br>    Defendants and Appellants. | A163486<br><br>(San Francisco County Super. Ct. No. JD20-3040) |

A.D. (mother) and H.Y. (father) appeal from a juvenile court order terminating their parental rights to their son, three-year-old Z.Y.  Mother claims that the court considered improper factors in concluding she did not establish the parental-benefit exception to termination.  This exception applies when there is "a compelling reason for determining that termination would be detrimental to the child" because a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (Welf. & Inst. Code, § 366.26,

1

subd. (c)(1)(B)(i).)[1] Father argues only that if we reverse the termination of mother's parental rights for this reason, we must also reverse the termination of his parental rights. We conclude that the court did not err in finding the parental-benefit exception inapplicable to mother and therefore affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In early 2020, mother, father, and then 17-month-old Z.Y. were homeless and staying with a friend in San Francisco.[2] They were receiving voluntary services due to concerns about domestic violence between mother and father and mother's mental health. Around 3:00 a.m. on February 1, father called the police to report he and Z.Y. had been kidnapped. When officers responded, father was outside on the street with Z.Y., who was under-dressed for the cold weather. Father admitted to using methamphetamine, and mother later admitted she had also used methamphetamine. Z.Y. was removed from the parents, and shortly afterward mother attempted suicide and was involuntarily hospitalized.

The San Francisco Human Services Agency (Agency) then filed a petition alleging that the juvenile court had jurisdiction over Z.Y. under section 300, subdivisions (b) and (c), based on both parents' drug use, mental-health issues, and history of domestic violence. The court ordered Z.Y.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Mother and father were not married, but father was declared Z.Y.'s presumed father after DNA testing confirmed a biological relationship. Because father does not claim on appeal that termination of his parental rights was independently improper, we do not discuss facts related to him except for context.

2

detained, and he was placed in a foster home. Mother was allowed to have supervised visits with Z.Y.

Due to the COVID-19 pandemic, the jurisdiction/disposition hearing was not held for another five months. During that time, mother had regular virtual visits with Z.Y. Z.Y.'s foster parents reported that he was "not excited to see his mother," who "was using the visitation time to share her personal problems with [the foster parents], instead of using the time to focus on [her son]."

In late August 2020, after both parents submitted on the issue, the juvenile court found true amended allegations under section 300, subdivision (b), that there was a substantial risk of harm to Z.Y. based on both parents' substance-abuse issues, mother's mental-health issues, and the parents' "volatile relationship." The court ordered reunification services for mother, and father waived services. Supervised visitation was also continued for mother.

A six-month-review report filed in January 2021 indicated that mother continued to visit regularly with Z.Y. She still discussed her personal problems with his foster parents, but she was also observed to be "nurturing toward [Z.Y.] in that she hugs, kisses[,] and praises [him] for his good behaviors." Between August and November 2020, mother missed several required drug tests and tested positive for methamphetamine three times, although she had recently entered a residential treatment program. She had not, however, started domestic-violence services or individual therapy as her case plan required. Overall, mother had "struggled to consistently engage in services" over the prior year, and the Agency recommended that her reunification services be terminated.

Two months later, the Agency filed an addendum report that observed mother had "minimally engaged in Case Plan services" since the previous update. She had begun domestic-violence services, but she failed to follow through on individual therapy. In addition, in mid-January 2021 she was discharged from the residential treatment program because she was using drugs, although she had recently been readmitted. As for visitation, mother continued to see Z.Y. both in person and virtually, but she missed several visits, appeared sleepy during others, and "struggle[d] [to have] age[-] appropriate conversations with [her son]." The Agency continued to recommend that mother's reunification services be terminated.

At the six-month-review hearing in April 2021, the juvenile court found that mother's progress toward mitigating the causes of Z.Y.'s out-of-home placement was "minimal." The court terminated her reunification services and set a selection-and-implementation hearing under section 366.26. Mother was permitted to continue virtual visits with Z.Y.

The section 366.26 report filed in July 2021 recommended that mother's and father's parental rights be terminated and adoption be Z.Y.'s permanent plan. The foster parents wished to adopt Z.Y., who had been in their care for over a year and "regard[ed] them as his parents." Mother continued to have visits with her son, which he "seemed to enjoy," and the report noted that he "appear[ed] to have a relationship with . . . mother and benefit[ed] from having consistent contact with [her]."

The following month, a contested section 366.26 hearing was held. A social worker, the only witness at the hearing, testified that based on her review of "the visitation documentation," mother's visits with Z.Y. generally "went well." Mother could be "very loving, very caring" toward Z.Y., and he generally was "glad to see [her]" and sometimes called her his mother. The

4

social worker agreed that it would be beneficial for Z.Y. to continue a relationship with mother "[i]n some capacity," and his foster parents were open to reaching a post-adoption contact agreement under which she could still have contact with him. The social worker opined that nonetheless, the benefits to Z.Y. of "continuity and permanency" outweighed those of preserving the parental relationship.

Mother's counsel then argued that the parental-benefit exception to termination applied. Noting that the social worker had described an "important and beneficial" relationship between mother and Z.Y., counsel contended it would be "improper for the [juvenile c]ourt to terminate parental rights" absent an "enforceable agreement" preserving the relationship. The Agency's counsel responded that mother needed to demonstrate not just a positive relationship "but a parent-child relationship, which requires expert testimony and an expert opinion." The Agency's counsel also argued that even if the requisite relationship had been proven, the benefits of continuing it were clearly outweighed by the benefits of adoption.

The juvenile court found by clear and convincing evidence that Z.Y. was adoptable, which neither parent disputed. The court ruled that the parental-benefit exception to termination did not apply, explaining as follows:

> "The Court finds that . . . in regards to the benefit of the relationship, there is a benefit, but I agree with [the Agency's counsel] that it is not a parental-bond exception benefit.
>
> " . . . I will find that [mother's] visits are regular and they have been going well, but I don't believe that it reaches the level of a parental-bond exception, which is a parental role in regards to the child.
>
> [¶] . . . [¶]

"In regards to [mother], the first part has been met, but I don't find that the relationship created by the visitation is such that it mandates a parental-bond exception—well, that is not a parental-bond exception.

"I find in regards to what the child is looking at and in regards to what the child is facing that it seems to me that the current caregivers in regards to their availability are of such a nature that it exceeds the benefit that is derived from visits by [mother.]

"I hope that the [post-adoption contact agreement] does go forward and creates an ongoing visitation, but at this point I don't find that [the] exception has been met."

The court then terminated mother's and father's parental rights.

## II.
### DISCUSSION

Mother claims the juvenile court erred by terminating her parental rights to Z.Y. because it relied on improper factors to conclude the parental-benefit exception did not apply.[3] We are not persuaded.

### A.    General Legal Standards

After a juvenile court determines that a child is adoptable, it must "terminate parental rights and order the child placed for adoption" unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One such exception is the "parental-benefit exception," whose scope the Supreme Court recently clarified in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). To establish the exception, a parent must demonstrate: "(1) regular visitation and contact,

---

[3] As previously noted, father joins this claim on the basis that if we reverse the termination of mother's parental rights, we must reverse the termination of his parental rights as well. (See Cal. Rules of Court, rule 5.725(a)(1) [prohibiting termination of parental rights of only one parent except in limited circumstances].)

and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Id.* at p. 631, italics omitted.)  As mentioned above, the juvenile court found mother maintained regulation visitation, and that element is not at issue.

Mother argues that reversal is required because the juvenile court used an incorrect legal standard to assess the second element of the parental-benefit exception, whether she and Z.Y. "had a beneficial relationship as defined by *Caden C.*"  *Caden C.* explained that to establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  In evaluating this element, "the focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)  The Supreme Court emphasized that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," and "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment[,] or physical care" [the parent] provided during . . . visits.' " (*Ibid.*)

Whether the second element of the parental-benefit exception is met requires a juvenile court to make a factual determination that we review for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)  The third element, "whether termination of parental rights would be detrimental to the child," also requires "a series of factual determinations" that we review for substantial evidence. (*Id.* at p. 640.)  But "the ultimate decision—whether

7

termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

> B. *The Juvenile Court Did Not Err in Assessing the Second Element of the Parental-benefit Exception.*

Mother claims the juvenile court improperly evaluated the statutory exception's second element because the court (1) "considered whether there was a 'parental-bond' between [her] and Z.Y., including whether expert testimony was required to show a beneficial relationship"; and (2) "analyzed Z.Y.['s] relationship with his then current caregivers." We consider these points in turn.

> 1. The description of the required relationship as "parental"

Before *Caden C.*, courts generally required parents to show they " 'occupie[d] a *parental role* in the child's life, resulting in a significant, positive, emotional attachment from child to parent,' " but "*Caden C.* did not use the words 'parental role' in its analysis." (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 209–210 (*L.A.-O.*), italics added.) As *L.A.-O.* explained, "the words 'parental role,' standing alone, can have several different meanings" that may be inconsistent with *Caden C.* (*L.A.-O.*, at p. 210; see *In re J.D.* (2021) 70 Cal.App.5th 833, 864 (*J.D.*) [the word " 'parental' . . . is vague and unhelpful in this context"].) For example, the phrase "can mean being the person whom the child regards as his or her parent (or at least as more his or her parent than any caregiver)," but "the parental-benefit exception does not require that the parent be the child's primary attachment." (*L.A.-O.*, at p. 210; see *J.D.*, at p. 865; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229–1230 (*B.D.*).) The phrase "can mean being a *good* parent—nurturing, supporting, and guiding," but under *Caden C.* a parent need not "have overcome the struggles that led to the dependency" or "be

8

capable of resuming custody" for the exception to apply.  (*L.A.-O.*, at p. 210.) And finally, although the phrase "can also mean giving parental care, such as changing diapers, providing toys and food, and helping with homework," this interpretation may conflict "with *Caden C.*'s warning that 'rarely do "[p]arent-child relationships" conform to an entirely consistent pattern.' " (*Ibid.*; see *In re D.M.* (2021) 71 Cal.App.5th 261, 270 (*D.M.*); *J.D.*, at p. 865.)

Based on the tension between the concept of a parental relationship and *Caden C.*'s discussion of the required beneficial relationship, several post-*Caden C.* decisions have reversed orders terminating parental rights and remanded for reconsideration where the juvenile court focused on the lack of a "parental bond" or "parental role" in determining the statutory exception was not met.  (*L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 210–211; *D.M.*, *supra*, 71 Cal.App.5th at pp. 270–271; *J.D.*, *supra*, 70 Cal.App.5th at pp. 863–865; *B.D.*, *supra*, 66 Cal.App.5th at pp. 1229–1230.)  In each case, either the juvenile court explicitly relied on improper factors (*D.M.*, at p. 270; *B.D.*, at p. 1228), or the Court of Appeal could not be sure that the lower court applied the correct legal standard when concluding a "parental" relationship did not exist (*L.A.-O.*, at pp. 211–212; *J.D.*, at p. 865).

Initially, although mother complains about the juvenile court's use of both the phrases "parental-bond" and "parental role," we focus our discussion on the latter phrase.  In ruling that mother did not meet the second element of the parental-benefit exception, the juvenile court used "parental-bond" only as an adjective in the phrase "parental-bond exception," and the court never stated that a "parental bond" was required.  Viewed in context, these references to the "parental-bond exception" do not imply that the court believed a "parental bond" was necessary.  *Caden C.* repeatedly referred to the "parental-benefit exception," wording that arguably also suggests a

9

parental relationship is required, but the Supreme Court emphasized that such labels "[did] not reflect any substantive determination about the requirements to prove the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 625, fn. 2.) Similarly, we will not ascribe any particular significance to the juvenile court's labeling of the exception.

In contrast, when the juvenile court indicated that mother did not meet the second element of the statutory exception—a relationship that would benefit the child if continued—because she did not occupy a "parental role," this reflected the court's substantive determination about the exception's requirements. We agree with the Agency that, as mother concedes, *L.A.-O.* and the other cases cited above do not hold that "consideration of whether the parent has acted in a 'parental role' is per se reversible error when declining to apply the [parental-benefit] exception." As *L.A.-O.* explained, in the pre-*Caden C.* case law "a 'parental role' is defined largely in terms of what it is not. It is not merely frequent and loving contact; it is not merely pleasant visits; it is not being merely a friendly visitor; and it is not merely an emotional bond (as opposed to a significant, positive, emotional attachment). *This list of 'nots' is consistent with* Caden C." (*L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 210–211, italics added.) Thus, while it may be "better not to use the words 'parental role' at all" because of their ambiguity (*id.* at p. 211), whether a juvenile court has improperly relied on the concept of a "parental role" to require something more than "a substantial, positive, emotional attachment to the parent" (*Caden C.*, *supra*, 11 Cal.5th at p. 636) must be judged in context.

A more recent decision, *In re A.L.* (2022) 73 Cal.App.5th 1131 (*A.L.*), illustrates this principle. In *A.L.*, the juvenile court determined that the child's father had a positive attachment to the child "from which she

benefited" and "that severing the minor's relationship with [the] father would be 'a loss.'" (*Id.* at p. 1149.) Nonetheless, the court concluded the parental-benefit exception did not apply, finding that the loss of this relationship "was one '[the minor] would be able to adjust to'" and "not[ing] that [her] caregivers had 'occupied the parental role' for the past one and one-half years of the minor's life." (*Ibid.*)

On appeal, the *A.L.* father claimed the juvenile court improperly considered whether he occupied a "'parental role' . . . in determining whether there was a beneficial relationship between [him] and [his] child." (*A.L.*, *supra*, 73 Cal.App.5th at p. 1154.) The Sixth District Court of Appeal disagreed, "conclud[ing] that the juvenile court—contrary to [the] father's contention—held that [he] in fact had satisfied the second [element] of the parental-benefit exception." (*Id.* at p. 1155.) Even though the lower court had mentioned the concept of a "parental role," its recognition of the pair's positive relationship demonstrated it had "made a finding that the minor would . . . benefit from continuing the relationship with [her] father."[4] (*Ibid.*)

Here, we similarly conclude that the juvenile court's reference to a "parental role" does not require reversal after considering the reference in context. To begin with, the juvenile court did not explicitly rely on improper factors, as did the lower courts in *B.D.* and *D.M.* In suggesting otherwise, mother claims only that the court erroneously "considered . . . whether expert testimony was required to show a beneficial relationship." We agree that

---

[4] At oral argument, mother contended that *A.L.* is inapposite because it concerned the third element of the parental-benefit exception. Although the juvenile court in that case mentioned the foster parents' "parental role" when addressing the third element, the father argued that the court's language showed it faulted him for not occupying a parental role for purposes of the second element. (*A.L.*, *supra*, 73 Cal.App.5th at pp. 1149, 1155.)

11

such evidence, while often highly relevant, "is not required as a matter of law" (*J.D.*, *supra*, 70 Cal.App.5th at p. 862), and the Agency's counsel incorrectly argued below that it was. But while the juvenile court "agree[d] with [counsel] that [the benefit of the relationship] is not a parental-bond exception benefit," it did not thereby indicate it accepted counsel's specific point about expert testimony. Nor did the court otherwise suggest its decision was based on the lack of such evidence.

We also conclude that the finding that mother did not occupy a "parental role" does not, when considered in context, raise a significant concern that the juvenile court applied an improper legal standard. Mother claims that the court's ruling was "terse," like those at issue in *L.A.-O.* and *J.D.*, meaning we should follow those cases and remand to ensure the correct law is applied. (See *L.A.-O.*, *supra*, 73 Cal.App.5th at p. 211; *J.D.*, *supra*, 70 Cal.App.5th at pp. 864–865; see also *In re D.P.* (2022) 76 Cal.App.5th 153, 166 [reversing under *Caden C.* where juvenile court "performed no specific analysis on the [parental-benefit] exception, instead finding only that the parents presented inadequate evidence to justify any exception"]; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319 [juvenile court must "do more than summarily state that a parent has not occupied a parental role"].) But in our view, this disposition would transgress the basic principle that " ' "[w]e must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed." ' " (*A.L.*, *supra*, 73 Cal.App.5th at p. 1161.) In particular, we normally assume that the lower court " 'kn[ew] and applied the correct statutory and case law in the exercise of its official duties.' " (*People v. Bankers Ins. Co.* (2020) 57 Cal.App.5th 418, 425.) And as *A.L.* explained, a court is "not required to state its findings in concluding that the parental-

12

benefit exception [does] not apply." (*A.L.*, at pp. 1156, 1161.) Thus, absent any affirmative indication that the court erred, we will not presume that it did so based merely on the ruling's brevity, which was understandable given the factual record. Mother did not testify, and there was a dearth of other evidence to support her position that the parental-benefit exception applied. This record further allays any concern we might have about whether the court applied the proper legal standard.

We acknowledge that there is some tension between our holding and *J.D.* and *L.A.-O.* But crucially, neither of those two decisions applied the presumption of validity to the challenged rulings, although the failure to do was understandable given the cases' procedural posture. The ruling being reviewed in *J.D.* predated *Caden C.*, which issued on May 27, 2021 (see *J.D.*, *supra*, 70 Cal.App.5th at p. 849), and the ruling at issue in *L.A.-O.* was made shortly after *Caden C.* (see *L.A.-O.*, *supra*, 73 Cal.App.5th at p. 203). Thus, the juvenile courts in *J.D.* and *L.A.-O.* did not have the benefit of *Caden C.*'s clarified legal standard when they referred to a "parental role." In contrast, the juvenile court's ruling here was entered two months after *Caden C.*, and other than the court's reference to a "parental role"—which is not legal error per se—there is no reason to assume the court was unaware of the Supreme Court's decision. Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted.

### 2. Consideration of Z.Y.'s relationship with his foster parents

We more quickly dispose of the other aspect of mother's claim, that the juvenile court improperly evaluated the second element of the parental-benefit exception because it "analyzed Z.Y.['s] relationship with his then current caregivers." Mother is correct that in assessing whether a parent has shown the requisite beneficial relationship, a juvenile court should not

13

"consider the suitability of [a child's] current placement." (*J.D.*, *supra*, 70 Cal.App.5th at p. 864.) Rather, the only question is whether "the child has a substantial, positive, emotional attachment to the *parent*" such that "the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636, italics added.)

Here, however, the juvenile court referred to Z.Y.'s foster parents in ruling on the parental-benefit exception's *third* element, not the second element. The third element requires a juvenile court to determine "whether the harm of severing the relationship [with the parent] outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court mentioned Z.Y.'s foster parents when ruling on the statutory exception only as follows: "I find in regards to what the child is looking at and in regards to what the child is facing that it seems to me that the current caregivers in regards to their availability are of such a nature that it exceeds the benefit that is derived from visits by [mother]." This comparison of the benefit to Z.Y. from continuing his relationship with mother to the benefit of staying in his foster parents' care is precisely what the third element requires. Moreover, although *Caden C.* cautioned that this analysis is "not a contest of who would be the better custodial caregiver" since a child cannot be returned to the parent's custody at a section 366.26 hearing (*id.* at pp. 630, 634), the court here said nothing to suggest it was comparing mother's parenting abilities to the foster parents'. In short, the court's reference to the foster parents was proper.

14

## III.
### DISPOSITION

The order terminating mother's and father's parental rights to Z.Y. is affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.



_____

Banke, J.



*In re Z.Y.*  A163486

16